Patrick J. Reilly (Bar # 6103)
preilly@hollandhart.com
HOLLAND & HART
9555 Hillwood Drive, 2nd Floor
Las Vegas, Nevada 89134
Telephone: (702) 222-2542

Jonathan M. Weiss (pro hac vice forthcoming)
jonathan.weiss@kirkland.com
Diana Torres (pro hac vice forthcoming)
diana.torres@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California  90071
Telephone: (213) 680-8400

Reed S. Oslan (pro hac vice forthcoming)
reed.oslan@kirkland.com
Justin A. Barker (pro hac vice forthcoming)
justin.barker@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone: (312) 862-2000

*Attorneys for Plaintiff*
*Absorption Pharmaceuticals, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ABSORPTION PHARMACEUTICALS, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> - vs. - <br><br> RECKITT BENCKISER, LLC, a Delaware limited liability company; and DOES 1–50, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR TRADE SECRET MISAPPROPRIATION; TORTIOUS INTERFERENCE; FRAUD; AND INJUNCTIVE RELIEF** <br><br> **Jury Trial Demanded** |

Plaintiff Absorption Pharmaceuticals, LLC ("Absorption") brings this action for damages and injunctive relief arising from trade secret misappropriation, tortious interference, and fraud against

1

Reckitt Benckiser, LLC ("RB").  The allegations herein are made based on personal knowledge as to Plaintiff and its own actions and interactions, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.       This is a case about theft and fraud.  For nearly two years, RB—part of a large and global conglomerate that owns such household brands as Lysol, Mucinex, Air Wick, Woolite, Durex, and K-Y—extracted a wealth of confidential sales, marketing, product, and manufacturing information about Absorption's highly successful premature ejaculation ("PE") product—Promescent®—under the guise that RB was considering acquiring Absorption.  Throughout discussions around the potential sale, both RB and Absorption understood that the crucial customer, sales, marketing, product, and manufacturing information that Absorption provided to RB in a good faith effort to move towards a transaction with RB was confidential, trade secret information.  Nonetheless, in September of 2016, RB launched its own competing PE product called Duration, and misappropriated the confidential sales, marketing, product, and manufacturing information that Absorption had shared.  After developing its own product using Absorption's confidential and proprietary information, RB broke off negotiations to purchase Absorption.

2.       In addition to stealing Absorption's trade secrets, RB set out to ensure that Absorption could not compete.  RB deliberately interfered with Absorption's efforts to market Promescent® by, among other things, wrongfully taking Absorption's shelf space in Target stores and causing Amazon to hide Promescent®'s listing while redirecting customers to Duration.

3.       Before the events giving rise to this litigation, plaintiff Absorption's Promescent® was poised to do for premature ejaculation ("PE") what Viagra did for erectile dysfunction.  The PE market was poised to achieve unprecedented success, and Absorption was ideally positioned to capture that opportunity through the combination of a uniquely effective PE treatment and hard-earned, inside knowledge of the market.  However, RB stole this opportunity from Promescent® by theft, artifice, and deceit.

4.       Absorption brings this complaint to hold RB accountable for its willful misappropriation of Absorption's trade secrets, fraudulent sham-acquisition process, and ongoing efforts to destroy Absorption's business and to remedy the severe injury that RB has inflicted and continues to inflict on

2

Absorption.  Among other relief, Absorption seeks compensatory damages in excess of $150 million, exemplary damages, attorneys' fees, and an injunction that enjoins RB from, among other things, selling, distributing, marketing or otherwise commercially using its Duration product.

## JURISDICTION AND VENUE

5.   This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises, in part, under the federal Defend Trade Secrets Act, 18 U.S.C. § 1832.  This Court has jurisdiction over Absorption's state law claims under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.   This Court has personal jurisdiction over Defendants because Defendants conduct or have conducted substantial business and have promoted their Duration products in the state of Nevada and this District, have purposefully availed themselves of the privilege of conducting business in Nevada, have contracted directly with a company located in Nevada (Absorption), have misappropriated trade secrets that they obtained from Nevada, and have harmed and continue to harm Absorption in this District by misappropriating and using Absorption's trade secrets and interfering with Absorption's contracts and business opportunities.

7.   Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this District, in Clark County, Nevada.  Venue lies in the Southern Division of this Court.

## THE PARTIES

8.   Plaintiff Absorption is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Las Vegas, Nevada.

9.   Defendant RB is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Parsippany, New Jersey.  There is complete diversity of citizenship because none of RB's members is a citizen of the same state as any of Absorption's members.  RB manufactures and distributes household products under numerous popular brands, including Lysol, Air Wick, Mucinex, Dr. Scholl's, Woolite, Clearasil, Frank's RedHot, French's Mustard, Airborne, Finish, Vanish, Veet, Durex, and K-Y.

10.     The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1 through 50, inclusive, are unknown to Absorption, who therefore sues said Defendants by such fictitious names and will ask leave to amend the Complaint to show their true names and capacities when they have been ascertained.  Absorption is informed and believes and thereon alleges that each of the Defendants designated herein as DOE is responsible in some manner for the events and happenings referred to in this Complaint.

11.     At all relevant times, all Defendants were agents of and acting on behalf of each other.

### FACTUAL ALLEGATIONS

### Absorption's History and Rapid Success

12.     PE is the most prevalent sexual dysfunction in males—more common than erectile dysfunction.  Nevertheless, only a small fraction of sufferers consult a physician and even fewer receive satisfactory treatment.

13.     Prior to Promescent®, there was no clinically proven, over-the-counter treatment for PE.

14.     Absorption was founded by urologist Dr. Ronald Gilbert, who developed Promescent® to give men an effective cure for PE and to close the "arousal gap" between men and women.  Clinical studies demonstrate that Promescent®, by delaying ejaculation in men, helps close this gap. Promescent® is an FDA-monograph-compliant lidocaine spray that is available over the counter.

15.     Since Promescent®'s 2011 launch, it has grown into a multi-million dollar product. Indeed, by 2012, Absorption had already attracted the attention of Auxilium, a much larger pharmaceutical company that saw Promescent's potential and approached Absorption to discuss a possible acquisition.  After careful consideration, Absorption decided to remain independent while it built its business.  But a determined Auxilium kept pursuing Absorption over the ensuing months.  Its efforts culminated in an offer on January 27, 2013 with upfront cash, sales milestone earn-outs, and future royalties worth over $150 million.  Elated, Jeff Abraham, Absorption's Chief Executive Officer, shared the news with his best friend, next door neighbor, and co-founder Dr. Ron Gilbert.

16.     The next day, Dr. Gilbert was murdered in a case of mistaken identity.  Abraham, distraught at his friend's tragic death, put off responding to Auxilium's offer, which Auxilium held open indefinitely.  Abraham relocated to Summerlin, Nevada two months later to escape the daily reminders

1  of his friend which surrounded him in their Orange County neighborhood.  There, he resolved to

2  redouble his efforts to make Absorption a success and create a fitting legacy for Dr. Gilbert and his

3  family.

4      17.     Absorption's website has a page dedicated to Dr. Gilbert, recognizing his vital

5  contributions to the success of Promescent®, which was for him a labor of professional love.  Abraham

6  requested as a condition of RB's acquisition of Absorption that RB maintain the page honoring Dr.

7  Gilbert.  When Abraham told RB the story of Dr. Gilbert and Abraham's desire to honor his memory,

8  RB commended Abraham and stated that RB had a "moral obligation" to honor Dr. Gilbert.  According

9  to RB, "It simply is the right thing to do!"



22      18.     Promescent®'s initial success was due largely to its innovative proprietary formula and

23  unique marketing strategies.  Promescent® is currently the only over-the-counter product available in

24  the United States that has been clinically proven to treat PE effectively.  Additionally, Absorption's

25  marketing of Promescent® is singularly innovative: Contrary to the conventional wisdom in the

26  industry, Absorption positioned Promescent® as a premium branded and priced product.  Absorption

27  also specifically designed its distribution and packaging strategies based on its proprietary understanding

28

of PE treatment consumers' demands.  Absorption also similarly tailored its promotional and marketing efforts.

19.     Promescent® garnered attention.  Promescent® has been featured in numerous media outlets, including Men's Health, CNBC, CNN, Men's Fitness, Esquire, Cosmopolitan, MSNBC, and Dr. Oz.  It has also been endorsed by a large number of medical professionals.

20.     Promescent® is sold to consumers online, through individual provider practices, and in selected brick-and-mortar stores.

21.     Absorption's marketing strategy is groundbreaking in this sphere: Absorption markets Promescent® as a premium product.  Promescent® is available in two sizes: A travel trial size small enough to fit in a pocket and a larger standard-size bottle.  Absorption also offers various bundles of these bottles, including a "home and away" bundle that combines a travel trial size with a standard-size bottle.

22.     Given the prevalence of PE and potential recreational users, Absorption knew that the PE treatment market was an untapped goldmine waiting for someone to come in and establish itself as the market leader.  Absorption thus felt the need to expand its distribution quickly to major retailers and to launch a massive marketing campaign—and to do so before anyone else beat it to the punch.  Absorption was also particularly interested in expanding to Southeast Asia and India, which it believed had an even larger demand for Promescent® than the United States due to increased prevalence of PE in these regions.  For example, a 2010 survey found that PE is one of the most common complaints amongst Indian men—with greater than 50% of respondents complaining of PE.  *See* India Today, *The New Pleasure Pill for Men* (Jan. 27, 2011) (citing 2010 ORG IMS study), *available at* http://indiatoday.intoday.in/story/the-new-pleasure-pill-for-men/1/126689.html.

23.     By 2014, Absorption was realizing exponential revenue growth—particularly strong given Absorption's size.  To capitalize on its rapid success and secure its place as the market leader for a long time to come, the small company felt that having the resources of a corporate partner with a large global presence could more quickly take Promescent® to the next level.  Auxilium was still interested and, indeed, kept its attractive opening offer on the table.  Around this time, RB also approached Absorption saying it was interested in an acquisition.

**RB's Business and Failed Foray into PE**

24.     RB is part of a large corporate family with operations worldwide, including Southeast Asia and India.  In fact, RB touts India as poised to become one of RB's top three markets.  RB's CEO, Rakesh Kapoor, was born and educated in India.  Among other positions, he was RB's General Manager for the Indian Southern Region and the Regional Marketing Director of South Asia before eventually becoming CEO.

25.     RB's brands are highly recognizable.  It is the maker of popular household products sold under brand names including Lysol, Air Wick, Mucinex, Dr. Scholl's, Woolite, Clearasil, Durex, and K-Y.

26.     In recent years, RB has come under significant public scrutiny for several corporate scandals.  In December 2016, RB was fined millions of dollars by an Australian court for deceiving consumers.  In early January 2017, a former executive at RB's South Korean sister company was sentenced to seven years in prison because of the sale of a toxic disinfectant linked to hundreds of lung injuries and over 50 deaths.  And, late last year, 41 states and the District of Columbia brought a lawsuit against RB for allegedly fabricating safety claims in order to delay the arrival of generic competitors to Suboxone, a drug manufactured by RB to combat opioid addiction, and thereby maintain its monopoly profits at the expense of recovering heroin and other opioid addicts.  The Colorado Attorney General, among the dozens of state attorneys general suing RB, accused RB of "shamelessly preying on patients in need of help" and vowed to "hold them accountable for their unconscionable tactics."  Suboxone accounted for as much as 20% of RB's global profits in recent years.

27.     Additionally, RB has a history of misappropriating small companies' intellectual property.  For example, in April 2016, in a case with remarkably similar overtones to the one here, RB was sued by Poo~Pourri Products, which makes industry-leading toilet deodorizers.  According to Poo~Pourri, RB met with Poo~Pourri's prospective distributor, copied Poo~Pourri's product, packaging and promotional materials (which RB passed off as its own), and thereafter caused the distributor to back out of its deal with Poo~Pourri, and instead to distribute RB's competing product.  RB also allegedly infringed on Poo~Pourri's trademarks, trade dress, and copyright.

28.    Given these incidents and what one commentator recently characterized as the aggressive "gung-ho" corporate culture permeating RB, there have been calls to slash the salary of RB's CEO, Kapoor, who, in 2015, was reportedly the third-highest-paid CEO at a U.K. public company.

29.    In March 2014, RB acquired the K-Y brand from Johnson & Johnson and thereafter began looking for opportunities to expand the K-Y product line.  As part of this effort, RB hired Stephen De Pretre as an acquisition consultant.  Notably, PE was not on the list of potential product categories that RB provided.  De Pretre nevertheless suggested that RB look into acquiring Absorption.

30.    Years prior, RB had marketed a PE treatment under its Durex label.  The Durex PE treatment was a cheap product that failed to penetrate the market and fizzled fast.  Thus, when RB first began looking for expansion opportunities, it was not interested in a PE product.  RB did not believe that a lidocaine-based PE spray could be effective or that one could earn sufficient profits to justify entering the PE market.

31.    Nevertheless, RB was apparently curious about Absorption after De Pretre presented the company to RB as a promising target.  Thus, in May 2014, Corrie Mueller, then Marketing Category Manager for Durex, ordered 8 bottles of Promescent® to RB's affiliate in Beijing, China.  After receiving these bottles, RB's executives became convinced that Absorption had unlocked a secret to success that RB's prior Durex offering had lacked.

32.    In May 2014, Mueller set up a telephone conference between Reckitt Benckiser Household Products (China) Co. Ltd.'s ("RB China") and Absorption.  Mueller provided a list of talking points for the meeting, which included the company's financial overview, supply and distribution chain details, and marketing overview.  She also offered to have personnel from RB China's legal department on the call.  RB China and Absorption also entered into a "Mutual Confidentiality Agreement."  When RB China signed this agreement and at all other relevant times, it intended to obtain Absorption's proprietary information to use wrongfully for its own benefit (and to Absorption's detriment).  Tellingly, the only change RB China made to Absorption's proposed Mutual Confidentiality Agreement was the last minute addition of an English choice of law clause and a permissive arbitration clause providing for the possibility of arbitration in London.  The United Kingdom does not provide statutory protection for trade secrets.  Consistent with RB's history of misappropriating small companies' intellectual property,

RB China made this change in anticipation of stealing Absorption's trade secrets and proprietary information.  RB China thus made this change to the Mutual Confidentiality Agreement in bad faith.

33.     The initial telephone conference included Abraham and Aditya Sehgal (then General Manager of RB China).  The call apparently went well, and talks between the two companies progressed rapidly.

34.     On June 4, 2014, Absorption's Abraham met with Volker Sydow, RB Global Category Director, Sexual Wellness Products, in New York City.  At all relevant times, Sydow was acting on behalf and for the benefit of RB.

35.     At the start of this meeting, Volker announced to Abraham that he needed to understand two things before proceeding: (1) that RB did not believe that a lidocaine-based PE spray can work, and (2) that RB did not believe that the market for a PE spray is large enough to justify entry.  He thus defined the two areas on which Absorption should focus its information disclosures in the due diligence process to come.  During this meeting, Abraham presented[1] to Sydow information about the potential size of the PE market and broader market for consumers looking to bridge the "arousal gap."  During this presentation, Abraham explained to Sydow the "arousal gap," and how to market Promescent® to consumers who would otherwise use ineffective home remedies.  This presentation also included information about Promescent®'s advantages over other competitors.  Sydow was so impressed that he asked Abraham to meet with Mueller in Las Vegas the very next day (which he did).

36.     Throughout these initial contacts, Abraham stressed to RB and its personnel that the PE market was a new frontier that had not yet been broken by any mainstream market leader, and that this acquisition was an opportunity to do just that—to establish Promescent® as the dominant market leader.

37.     Sydow quickly recognized Promescent®'s potential.  On June 8, 2014, Sydow thanked Abraham for giving him Promescent® samples and raved about it: "[p]roduct is good, no worries! We just **need to understand the consumer story** around it—the more you have done and you can share, the better."  (Emphasis added.)

---

[1]     The presentation began with a slide that contained a confidentiality agreement and stated that by viewing the document the recipient agrees to keep the information in the presentation confidential.

38.     In the same month, Sydow told Absorption that it planned to offer Absorption $20 million cash and a six percent (6%) royalty on product sales.

**RB Probes Absorption for Proprietary Data Under the Guise of "Due Diligence"**

39.     RB obviously liked what it learned during its first forays with Promescent®, and thereafter continued to court Absorption aggressively, diving head first into "due diligence" for what it called "Project Speedy."

40.     Less than ten days after telling Abraham that Promescent® is a good product, Sydow informed Abraham that RB's CEO (Kapoor) had given him the "go ahead" to look "into detail" at Absorption's "fabulous" Promescent® product.

41.     Thus, on June 25, 2014, the parties held a "kick-off" telephone conference and RB sent a spreadsheet with over 60 detailed "due diligence questions" which it wanted Absorption to answer about 15 topics, including Absorption's business and market, finance and accounting, intellectual property, regulatory, information technology, supply, market research and consumer, technology, and marketing and communication.

42.     Faced with the prospect of disclosing Absorption's highly-valuable trade secrets, Abraham sought reassurance that RB's interest was serious.  He conveyed to RB that Absorption's investors were uneasy because Absorption had another acquisition offer that would expire if not acted upon and RB still had not provided the term sheet that Absorption had requested.  RB's Corporate Development Director, Kavan Stewart, called Abraham and assured him verbally of RB's intention to move forward with an acquisition.  At all relevant times, Stewart was acting on behalf and for the benefit of RB.  Sydow also assured Abraham that "[g]etting a royalty from a much larger pie is the big price to win with RB" and thus assessing the potential size of the pie "is the **core exercise** we need to run."  (Emphasis added.)

43.     Having been mollified by Sydow and Stewart, Absorption sent RB the first two "due diligence" responses (about Absorption's patents and trademarks), as a gesture of "good faith."

44.     The next day, Sydow informed Abraham that some "internal (very senior..) colleagues" to whom Sydow had given Promescent® samples had just informed him that "THEY THINK IT IS

FANTASTIC.  IT REALLY WORKS."  Sydow also asked Abraham to send more Promescent®

samples to RB's offices.

> **From:** Sydow, Volker [mailto:Volker.Sydow@rb.com]
> **Sent:** Thursday, June 26, 2014 9:02 AM
> **To:** jeff.abraham@promescent.com
> **Subject:**
>
> Jeff, got some feedback from internal (very senior..) colleagues  of mine to whom I supplied P. samples to. THEY THINK IT
> IS FANTASTIC. IT REALLY WORKS..
> Just wanted to let you know.. not that I did not know before..
> And of course I'd like to order more samples. However, you just told me that you do not ship any more to outside of the
> USA.... ;)
>
> Regards
> Volker

45.     On June 30, 2014, Abraham complained to Sydow that he still had not heard anything

from Stewart about a term sheet and warned RB that he anticipated beginning due diligence with another

company soon.  In his email, Abraham also emphasized the need to move quickly to establish

Promescent® as "THE" market leader.

46.     On July 9, 2014, Brian Robertson, RB's Senior Vice President of Corporate

Development, and Stewart sent to Absorption a letter acknowledging that Absorption had received

interest from other parties, but insisting on the superiority of RB's brands and global presence (including

in China and India).  The RB executives concluded their letter by asking Absorption to "bear with us

and **continue to help us in our due diligence effort**" so they could put together a proposal including

their "thoughts on economic terms."  (Emphasis added).  Finally, they expressed their expectation to be

"in a position to formalize a proposal to you within 30 days."

47.     Thus, RB had assured Absorption that it believed in the Promescent® product, intended

to make an offer, and that the key issue for RB was determining the size of the potential market for

Promescent®.  Absorption was well aware of the size of the market for its product, and therefore knew

this would not be an issue.  On the basis of this knowledge and RB's assurances, Absorption proceeded

to unveil its most valuable trade secrets.

48.     During the ensuing weeks, Absorption responded to RB's "due diligence" requests by

providing numerous documents detailing Absorption's proprietary information regarding its customers,

marketing, business strategy, sales, profit margins, distribution, patents, and formulation (including detailed step-by-step manufacturing instructions regarding Promescent®'s production).  RB placed particular emphasis on Absorption's profit margins, customer retention rates, customer purchasing patterns, and the impact of media coverage on sales.  Absorption provided to RB all of the information that it requested.

49.     Additionally, at a later date and after De Pretre had started working for Absorption, De Pretre met with Sydow.  During that meeting, Sydow showed De Pretre tests that RB was conducting of Promescent®.  These tests involved spraying Promescent® on skin from human cadavers to monitor the degree of absorption.  During this meeting, De Pretre shared Absorption's secret information regarding what makes Promescent® effective.

50.     Throughout the "due diligence" process, Abraham and Sydow also had numerous conversations during which Abraham would explain the key aspects of Absorption's business and marketing strategies.  For example, Abraham explained the reasoning behind and importance of selling both online and in brick-and-mortar stores.  He also disclosed his ideas for how to market Promescent® to position it for both therapeutic and recreational use.  During at least one of these conversations, Sydow stated that RB's market power was so strong that it could induce retailers—including Target—to take shelf space away from other companies' products to immediately make room for RB's products. Sydow also stated to Abraham that RB has significant influence over Amazon.com.  In particular, Sydow emphasized that RB made Amazon nearly a hundred million dollars in commissions on its products annually and said that "Amazon does not tell us what to do, we tell Amazon what to do." Alexander Lacik, President of RB's North American operations, also made similar comments.

51.     Throughout the Project Speedy "due diligence" process, RB continually delayed committing to a formal offer with excuses and promises that a formal offer would be forthcoming.  For example, sometime between July 9 and August 18, 2014, after Abraham complained that Absorption still had not received a formal offer, Sydow informed him that an offer was sitting on Kapoor's desk and waiting for a signature.  Such statements were false and made to keep Absorption from moving forward with an acquisition by another company.

52.     In the midst of this process, RB asked Absorption to send 15 kilograms of bulk product for "condom testing."  This is enough Promescent® to fill thousands of standard-sized bottles.  At the time, Absorption did not have experience with this type of testing and thus did not know the quantity of product required.  However, it later learned that this quantity is far in excess of anything that RB could reasonably need for condom testing.

53.     In mid-July 2015, Abraham had a phone call with Stewart in which Stewart assured Abraham that an offer would be forthcoming.  While RB did not give any concrete terms, Stewart claimed that the offer would be something less than the $20 million cash that had been previously discussed, but that the royalty would go from six percent (6%) to ten percent (10%).

54.     On August 18, 2014, Abraham met with Lacik in Parsippany, New Jersey.  During this meeting, Lacik asked numerous questions about Absorption's customers and customer retention.  Abraham showed Lacik Promescent.com's "transactional portal" which contained Absorption's order history and trends, including repeat customer percentages.  Lacik exclaimed that he "ha[d] to have this product and put it in [RB's] KY line.  It is a perfect fit!"  During the meeting, Lacik started composing an email to Kapoor (which he showed to Abraham) conveying Lacik's support of acquiring Absorption.

55.     Lacik understood the potential size of the PE market and that the Absorption acquisition would be an opportunity to establish a product as the leader in this untapped market.  RB, however, had no intention of lawfully acquiring Absorption, but sought only to acquire unlawfully Absorption's trade secrets.

**RB Abruptly Ends Negotiations**

56.     After this meeting, rather than convey the long-promised acquisition offer, RB informed Absorption that it wanted to conduct an outside market study to validate the size of the potential market before committing to a formal offer.  Abraham asked Sydow to provide a copy of any study generated.  Sydow responded that he was willing and anticipated being able to do so.  Around the same time, RB also raised questions regarding regulatory issues concerning Promescent®.

57.     RB was not actually concerned about either the market size or any regulatory issues.  Instead, it simply wanted to stall talks with Absorption while RB developed its own competing product.  Nevertheless, RB verbally assured Absorption that a potential deal was "still live."

58.     During the ensuing months, RB continued assuring Absorption of its continued interest every time Absorption indicated that it was growing impatient and considering other options.  For example, on October 23, 2014, Abraham told Sydow that he was being pressured to send a letter to RB informing them that negotiations appeared to be at an end.  On roughly the same date, Sydow sent Abraham a text message saying "don't sign anything [with any other company.]"  At the time, Absorption had been approached by another company about a potential acquisition, but declined to pursue the opportunity in reliance on RB's assurances of an intent to enter into a deal and on Sydow's urgings to not sign with another company.

59.     When RB's outside market study concluded, Sydow informed Abraham that it showed that the market was not as large as Absorption had thought.  Instead, RB's study supposedly forecasted a market of $30-$40 million from advertising spending of $10 million.  Nevertheless, Sydow informed Abraham that a deal with Absorption was still very possible.  Sydow thereafter told Abraham that RB intended to present all of the information to Kapoor in late January 2015.

60.     At the end of January, Sydow informed Abraham that he had presented the Absorption acquisition to Kapoor and that they needed to have a follow-up meeting, which he then claimed was delayed.  Abraham emailed Sydow and informed him that Absorption was in talks with other companies and that he was facing tremendous pressure to move forward with those companies rather than RB.

**From:** Jeff Abraham
**Sent:** Thursday, January 22, 2015 12:31 PM
**To:** Sydow, Volker
**Subject:** Sorry for the outburst

**Follow Up Flag:** Follow up
**Flag Status:** Flagged


Volker,

I am under tremendous pressure right now and our Chief medical officer is the guy who is connected to Perrigo and he is all over me asking why I am putting them off. We are really taking off and I don't want to hire people if we are getting acquired soon and I am now literally working 24/7. I am working on a new manufacturing run and have some excellent promotional opportunities and it is just overwhelming. Our shareholders have felt for a long time that I am completely intent on RB only and if this falls apart again I am going to get tarred and feathered. I will work the others in parallel and just hope this happens. I just know that getting in the deep due diligence takes so much of my time that it is draining. I know you are doing all you can, please let me know however if at some point it appears RB is not really sold on Promescent.

Jeff Abraham
CEO
Absorption Pharmaceuticals
702-228-046



PROMESCENT®
MAKE LOVE LONGER


61.      Sydow again mollified Abraham, assuring him that RB was not deliberately delaying progress, that a deal was imminent, and to hold off on pursuing other opportunities for just a little while longer.

62.      Around January 28, 2015, Abraham had a phone conversation with Sydow in which he accused RB of creating its own "knock off" PE spray.  Sydow assured Abraham that RB was not knocking off Promescent.  However, in reality, that is exactly what RB was planning to do.

63.      In the ensuing months, Abraham repeatedly asked Sydow to share details of RB's market survey analysis, puzzled by a market forecast that was orders of magnitude smaller than Absorption's customer data and sales information projected and supported.  Contrary to his earlier representations, Sydow claimed that he could not share this "confidential" information, and thus RB never shared any information about its supposed market study with Absorption.

64.     In April 2015, Absorption learned from a reliable source that RB was planning to launch a lidocaine-based PE spray.  It was unclear from this source whether that spray would be Promescent® or an RB knock-off.  Abraham called Sydow and confronted him—demanding to know whether RB was knocking off Promescent® or introducing its own spray for PE.  Sydow assured Abraham that RB was not knocking off Promescent® and was not introducing a spray for PE.  Based on Sydow's representations, Absorption did not investigate the issue further and took no steps to protect itself from RB's launch of a competing product.  However, unbeknownst to Absorption, Sydow was lying.  At the time, RB was actively planning to launch its own spray for PE.

65.     For months thereafter, contact between Absorption and RB was sparse.

**While Preparing To Launch Its Own Product, RB Attempts To Obtain Updated Confidential Marketing and Technical Product Information From Absorption Under The Guise of Renewed Interest In A Deal**

66.     Then, in late 2015, the parties reengaged.  By December 2015, it appeared that RB had a renewed interest in Absorption, and, through a communication from Sydow to De Pretre (who was then working for Absorption), sought to obtain updated information about Absorption's sales, customers, and new technological developments.

67.     In January 2016, RB, through Sydow, again claimed to be interested in a deal with Absorption.  Sydow also stated that he wanted to "make sure we will set this up in a way that neither side will be impacted negatively if we decide after these discussions that it will not be the right decision for us to collaborate."  The parties thus began negotiating a new NDA.

68.     In February 2016, RB rejected the NDA that Absorption proposed, and instead submitted a "Two Way Confidentiality Agreement" that was anything but mutual, and effectively left Absorption without the ability to enforce it.  Absorption rejected RB's proposal and ceased further communications regarding a potential acquisition.

69.     Nevertheless, between February and May 2016, RB's Research & Development Department ordered nearly 70 bottles of Promescent® using a personal credit card for delivery to the personal home address of the R&D department's director.  RB refrained from using its business name, address, and credit card because it wanted to avoid detection by Absorption.

70.     On May 3, 2016, RB submitted an intent-to-use trademark application for K-Y for "[m]edicated sprays, liquids, gels and creams for desensitizing the penis and preventing premature ejaculation."  *See* U.S. Trademark Application Serial No. 87023826.  In August 2016, RB submitted a second intent-to-use application for "Last Longer Stay in the Moment" for use with the same category of goods.

71.     Unbeknownst to Absorption, RB began producing the first batches of its competing product—Duration—in June 2016.

72.     On July 15, 2016, Sydow directed his assistant to resend to Abraham for signature the new NDA which Abraham had previously rejected as unacceptably one-sided.  The timing of this email made no sense.  The new NDA was purportedly in connection with renewed acquisition talks when in reality RB had already registered an intent-to-use trademark for Duration and had begun manufacturing the product.  When Abraham questioned why she was suddenly re-sending out of the blue an agreement that he had rejected months earlier, she claimed that she was "clearing up [her] emails and came across that one [meaning the 'Two Way Confidentiality Agreement']."

73.     A few weeks later, on September 1, 2016, RB launched Duration spray for men with the largest marketing campaign in K-Y's history.  RB invested $40 to $50 million in marketing alone, reflecting a projected initial market of half a billion dollars.  This was the same estimated initial market size that Absorption's CEO had communicated to RB during RB's "due diligence" based on extrapolations from Absorption's customer data and repeat user information.  And yet, RB falsely claimed to Absorption that its research found the PE market inadequate to justify an acquisition, with at best a $30 to $40 million market.

74.     Just as Absorption had positioned Promescent®, RB aimed its campaign to appeal to both therapeutic and recreational users.  RB also put into use Absorption's confidential marketing strategies, which RB had obtained during the "due diligence" process.  And, like Absorption, RB made Duration available in a small trial size and a larger standard-size bottle and offered it for sale both online and in brick-and-mortar stores, using nearly identical price points to Promescent®.  To add insult to injury, RB launched Duration in a blue and white color scheme, strikingly similar to that of Promescent®.  Indeed,

17

the packaging of Duration depicts a blue and white bottle that looks more like a bottle of Promescent® than a bottle of Duration.

75.     In sum, RB strung Absorption along while it plundered Absorption's data and developed its own competing product.  It also caused Absorption to forego other acquisition opportunities.  Then, RB launched its own directly competitive PE treatment, which it has tried to establish as a market leader—thereby usurping the opportunity that Absorption had discovered and brought to RB's attention.  And it did so by mimicking Promescent®'s packaging, marketing, and sales strategy—all in a transparent attempt to steal Absorption's hard-earned business.

### RB Knocks Promescent® Off Target's Shelves and Otherwise Interferes with Absorption's Business

76.     To ensure the success of Duration, RB had to make sure it faced no competition from Promescent®.  To do this, it used its substantial market power to command retailers to place RB's new product in strategically beneficial positions and to cut out its competition—in this case, Promescent®.

77.     Around March 2016—before RB launched Duration—Absorption entered its biggest-ever distribution agreement: an agreement with retailer Target to begin stocking Promescent® on shelves in 1,600 stores starting in October 2016.  Target agreed to carry 4 SKUs—2 small bottles and 2 large bottles.  The agreement also required Absorption to create Target-specific packaging and to commit to a large advertising campaign.  Reflecting Target's enthusiasm for carrying Promescent®, Absorption secured Target's agreement in one day.

78.     Starting in May 2016, Absorption invested at least $400,000 on Target-specific packaging and committed to a $2 million advertising campaign.

79.     Thereafter, Absorption also paid a substantial fee to register product codes for the products to be stocked in Target.  These codes are made available to other producers with registered products, including RB.

80.     In July 2016, Target suddenly informed Absorption that there were new product launches in the same category as Promescent® and it did not know if the space that it had committed to Absorption would be available in October.  In the following weeks, Absorption confronted Target and demanded that Target honor its agreement to stock Promescent®.  These discussions culminated in an

email from Target in August 2016 stating that it would not launch Promescent® in its stores in October. Upset about Target's sudden about-face, Abraham met with Target's executive buying team on August 10, 2016.  During this meeting, Abraham confronted Target's executive about whether RB caused Target to divert Promescent®'s shelf space to Duration, specifically naming Sydow and Lacik as the RB individuals involved in this interference.  Target did not deny Abraham's account and instead agreed to carry one trial size SKU of Promescent® in its retail stores but Absorption lost hundreds of thousands of dollars that it spent on Target-specific packaging for the three dropped SKUs and even more in lost business opportunities.

81.     Target currently stocks its retail stores with 4 SKUs of Duration—the same configuration that it had originally promised to Promescent®.  RB caused Promescent®'s sole SKU to be hidden within Duration displays.



82.     RB also used its influence with Amazon.com to interfere with Promescent®'s distribution through that website.  Although Promescent® had always been among the general merchandise at Amazon, shortly before Duration launched, Promescent® was suddenly relegated to the "hidden" "adult section" of Amazon.com.  Products in the "adult section" do not appear as results of a standard search.  Instead, the user must specifically click a button telling Amazon.com to display "adult"

products responsive to the user's search.  Though Duration is the same type of product as Absorption, it was placed in a standard (non-"adult") category and thus received the full visibility that had previously been afforded Promescent®.  Lest there be any doubt that RB caused Promescent® to be specifically singled out and hidden: Other similar (though far less successful and competitively threatening) PE treatments were not flagged as "adult"—notwithstanding the sexually suggestive and explicit branding of such products.

83.     During this time, Absorption repeatedly complained to Amazon about the unequal treatment that Promescent® received—beseeching Amazon to treat similarly situated products in the same manner.  Absorption repeatedly complained that if Promescent® was an "adult" product, then Duration should be treated similarly.  On several occasions, low level Amazon customer service representatives moved Duration to the "adult section" when Absorption complained.  However, each time, Duration was moved back to a standard category in short order, while Promescent® inexplicably remained in the "adult section."

84.     After repeated complaints over an extended period of time to Amazon's "category manager," including letters written by Absorption's counsel, the visibility of Promescent® as a general merchandise (as opposed to "adult") product was finally restored; however, sales have not recovered.

85.     To divert even more business from Absorption, RB used the registered trademark Promescent® to direct Amazon users to Duration.  For example, starting in the last week of September 2016, a user searching on Amazon.com for "Promescent" "Promescent Spray" was shown a list of search results only to alternative products, with "Duration" appearing at the top of the search results.

86.     RB also purchased the federally registered trademark "Promescent" as a keyword to advertise RB's Duration product, thus causing advertisements for Duration to appear directly adjacent to the purchase button on the Amazon.com listing for Promescent®.  Not coincidentally, Absorption was denied the ability to advertise Promescent® on Amazon.com using its own trademark—or any trademark at all—even though Absorption had previously been allowed to do so.  This, too, was RB's doing.

87.     RB further interfered with Absorption's distribution by causing banner ads to be placed directly below the purchase button for Promescent® on Amazon.com.  Given that RB also deliberately

chose product packaging for Duration that depicted a bottle that was confusingly similar to Absorption's bottle, this ad was likely to cause substantial confusion and to divert customers from Promescent® to Duration.



88.      Around the same time that RB interfered with Absorption's distribution on Amazon.com and Absorption's contract with Target, a planned promotional television segment regarding Absorption was bizarrely produced without any reference to Absorption or Promescent®.  In September 2016, the popular television show "The Doctors" planned to air a promotional segment featuring Promescent® and the recently-concluded study showing Promescent®'s efficacy.  The producers of "The Doctors" agreed with Absorption's marketing firm to do so.  Absorption provided "The Doctors" with Promescent® product and arranged, at its expense, to fly the author of the study to Los Angeles for the taping.  Just prior to the scheduled flight, however, Absorption was informed that "The Doctors" no longer intended to feature the study, despite the fact that the study had been of great interest to the producers.  Not only did the producers drop the reference to the study, when the segment aired on September 29, 2016, there was no mention of Promescent® or Absorption *at all*.  Instead, the segment had been re-edited to eliminate all references to the product name but to suggest that the product was

really Duration.  The after-the-fact re-editing is apparent because at one point, one of the panel physicians grabbed a bottle and states "It's called Pr—."  *See* http://www.thedoctorstv.com/articles/3407-penis-spray-to-make-men-last-longe (at 0:44).

89.     Defendants' aforementioned actions have caused and will continue to cause Absorption to suffer irreparable harm.  This injury will likely continue indefinitely unless Defendants' are restrained from such behavior.

## COUNT I

### (Against All Defendants)

### Fraud

90.     Absorption incorporates by reference and repeats the allegations contained in Paragraphs 1 through 89 as though fully set forth herein.

91.     As previously alleged herein, Defendants intentionally misrepresented or concealed material facts from Absorption to induce Absorption to divulge its proprietary information and/or to forego its opportunity to contract with Auxilium.  For example, (1) Sydow represented that RB intended to make an offer to acquire Absorption of $20 million cash and a six percent (6%) royalty on product sales; (2) Robertson and Stewart stated that RB intended to make a formal offer to acquire absorption within 30 days; (3) Volker stated that RB was not deliberately delaying providing a formal offer; and (4) Volker stated that RB was not creating a Promescent® knock off and was not introducing a spray for PE.

92.     At all relevant times, Defendants knew that each of these representations was false.

93.     At all relevant times, Defendants intended to induce Absorption to divulge its proprietary information and/or to forego its opportunity to contract with Auxilium or other companies in reliance on Defendants' representations.

94.     Absorption justifiably relied on Defendants' false representations.  As a result of the directions, actions, omissions, misrepresentations, and/or concealments effected by Defendants, Absorption was induced to divulge its proprietary customer and business information, to forego the deal with Auxilium, to forego opportunities with other companies, and to avoid taking steps to protect itself against RB's launch of a competing product.

95.     Absorption has thereby suffered lost profits, Defendants' unjust enrichment, and other harm in an amount to be proved at trial.

96.     Defendants' conduct amounts to intentional concealment and/or misrepresentation of facts known to them, made with the knowledge that such misdeeds would or could harm Absorption. Such conduct was fraudulent, oppressive, or malicious, and was carried out in conscious disregard of Absorption's rights, so as to justify an award of punitive damages.

## COUNT II

### (Against All Defendants)

### Federal Trade Secret Misappropriation in violation of 18 U.S.C. §§ 1836, 1839

97.     Absorption incorporates by reference and repeats the allegations contained in Paragraphs 1 through 96 as though fully set forth herein.

98.     Absorption's proprietary financial, product, manufacturing, marketing, business, and customer information ("Trade Secrets") are statutory "trade secrets" protected by the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, 1839.

99.     Absorption's Trade Secrets are sufficiently secret to derive economic value from not being generally known to and not readily ascertainable through proper means by other persons who can obtain economic value from their disclosure or use.

100.    At all times, Absorption has taken reasonable measures to protect the secrecy and confidentiality of Absorption's Trade Secrets, including by consistently requiring any parties to whom it discloses any of its Trade Secrets to sign confidentiality agreements.

101.    On or after May 11, 2016, the effective date of the Defend Trade Secrets Act, Defendants actually misappropriated Absorption's Trade Secrets through improper acquisition, disclosure, and/or use without Absorption's express or implied consent.

102.    Defendants intentionally misappropriated Absorption Trade Secrets by, among other things: (1) obtaining the information by falsely representing that they were interested in acquiring Absorption; (2) inducing Absorption to share its Trade Secrets with the hidden intention of converting them for Defendants' own use; and (3) improperly using the information to design, produce, market, and sell a product directly competitive with Absorption's Promescent®.

103.     The trade secret information misappropriated by Defendants is related to Duration, which is used in, and intended for use in, interstate or foreign commerce.

104.     As competitors of Absorption, there is a genuine, imminent threat that Defendants will continue to use Absorption's Trade Secrets in the course of their business.

105.     Absorption has suffered and will suffer damages, including, but not limited to, actual loss and unjust enrichment by Defendants, in an amount to be proven at trial, as a direct result of Defendants' misappropriation of Absorption's Trade Secrets.

106.     Defendants' misappropriation of Absorption's Trade Secrets has been willful and malicious and entitles Absorption to exemplary damages and an award of attorneys' fees and costs pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3).

107.     Absorption also is entitled to injunctive relief to prevent the misappropriation of Absorption's Trade Secrets by Defendants pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3).  Defendants' misappropriation has caused and will cause Absorption to suffer substantial and irreparable harm, including the failure of its business, unless Defendants are enjoined from retaining and using Absorption's Trade Secrets, including by continued production and sale of Duration.

### COUNT III

**(Against All Defendants)**

**Nevada Trade Secret Misappropriation**

108.     Absorption incorporates by reference and repeats the allegations contained in Paragraphs 1 through 107 as though fully set forth herein.

109.     Absorption's proprietary financial, product, manufacturing, marketing, business, and customer information ("Trade Secrets") are statutory "trade secrets" protected by the Nevada Uniform Trade Secrets Act, Nev. Rev. Statutes, Chapter 600A.

110.     Absorption's Trade Secrets are sufficiently secret to derive economic value from not being generally known to and not readily ascertainable through proper means by other persons who can obtain economic value from their disclosure or use.

111.    At all times, Absorption has taken reasonable measures to protect the secrecy and confidentiality of Absorption's Trade Secrets, including by consistently requiring any parties to whom it discloses any of its Trade Secrets to sign confidentiality agreements.

112.    Defendants intentionally misappropriated Absorption Trade Secrets by, among other things: (1) obtaining the information by falsely representing that they were interested in acquiring Absorption; (2) inducing Absorption to share its Trade Secrets with the hidden intention of converting them for Defendants' own use; and (3) improperly using the information to design, produce, market, and sell a product directly competitive with Absorption's Promescent®.

113.    As competitors of Absorption, there is a genuine, imminent threat that Defendants will continue to use Absorption's Trade Secrets in the course of their business.

114.    Absorption has suffered and will suffer damages, including, but not limited to, actual loss and unjust enrichment by Defendants, in an amount to be proven at trial, as a direct result of Defendants' misappropriation of Absorption's Trade Secrets.

115.    Defendants have engaged in willful, wanton, and reckless misappropriation of Absorption's Trade Secrets and have disregarded Absorption's rights.  Accordingly, Absorption is entitled to exemplary damages under N.R.S. § 600A.050 and an award of attorneys' fees and costs pursuant to N.R.S. § 600A.060.

116.    Absorption also is entitled to injunctive relief to prevent the misappropriation of Absorption's Trade Secrets by Defendants pursuant to N.R.S. § 600A.040.  Defendants' misappropriation has caused and will cause Absorption to suffer substantial and irreparable harm, including the failure of its business, unless Defendants are enjoined from retaining and using Absorption's Trade Secrets, including by continued production and sale of Duration.

## COUNT IV

### (Against All Defendants)

### Intentional Interference with Contract

117.    Absorption incorporates by reference and repeats the allegations contained in Paragraphs 1 through 116 as though fully set forth herein.

118.   Absorption had valid and existing contracts: (1) with Target to distribute 4 SKUs of Promescent® in Target's stores; and (2) with Amazon to distribute Promescent® via its website.

119.   Defendants knew of each of these two contracts.

120.   Defendants intentionally acted to disrupt Absorption's contract by demanding that Target refuse to honor the agreement to carry 4 Promescent® SKUs, and instead devote the shelf space promised to Absorption to RB's Duration.

121.   Absorption's contract with Target was actually disrupted.  Target refused to carry all 4 Promescent® SKUs that it had originally agreed to stock in its retail stores.  Instead, Target only stocked 1 Promescent® SKU—a travel trial size bottle.

122.   Defendants intentionally acted to disrupt Absorption's contract by demanding that Amazon.com relegate Promescent® to the "adult" category and by demanding that Amazon.com act to divert customers searching for Promescent® to Defendant's competing Duration product.

123.   Absorption's contract with Amazon.com was actually disrupted.  For example, Amazon improperly categorized Promescent® as an "adult" product and thereby relegated Promescent® to the hidden "adult section"—even though the competitive Duration was not similarly categorized. Additionally, an Amazon search using the federally trademarked term "Promescent" (or "Promescent Spray") directed consumers to alternative products, with "Duration" appearing at the top of the search results.  Moreover, if a consumer were to tick the "Promescent" box to the left of the search results page, the message "Your search 'promescent' did not match any products" appeared.  These are only some of the ways in which Absorption's contract with Amazon.com was disrupted.

124.   Defendants' disruption of Absorption's contracts with Target and Amazon caused Absorption harm.  As a result of this disruption, Absorption lost at least $400,000 that it spent in Target-specific packaging, and also suffered actual damages, lost profits, Defendant's unjust enrichment, and other harm in amounts to be proven at trial.  Such conduct was fraudulent, oppressive, or malicious, and was carried out in conscious disregard of Absorption's rights, so as to justify an award of punitive damages.

## COUNT V

### (Against All Defendants)

### Tortious Interference with Prospective Economic Advantage

125.    Absorption incorporates by reference and repeats the allegations contained in Paragraphs 1 through 124 as though fully set forth herein.

126.    There was a prospective contractual relationship between Absorption and Auxilium, which had offered to acquire Absorption for as much as $150 million.

127.    To the extent that Absorption did not have actual contractual relationships with Target and Amazon, Absorption had prospective contractual relationships with these entities.

128.    Defendants were aware of Absorption's prospective contractual relationship with Auxilium because Absorption repeatedly told them about this prospective relationship.  Defendants were also aware of Absorption's prospective contractual relationships with Target and Amazon.

129.    Defendants intended to harm Absorption by preventing the relationship with Auxilium. Defendants repeatedly told Absorption to wait and not sign any acquisition deals with the other companies courting Absorption—including Auxilium.  Defendants made these statements not because RB intended to acquire Absorption, but solely because Defendants did not want Absorption to move forward with another deal that would allow Absorption to expand Promescent®'s reach before RB could create its own competing product.

130.    Defendants intended to harm Absorption by preventing its relationships with Target and Amazon.  RB had boasted of its ability to interfere with other companies' distribution efforts at retailers such as "Target" and "Amazon."  RB was also aware that the PE market was ripe for a leader to emerge and raise barriers to entry.  RB interfered with Absorption's prospective contractual relationships because RB wanted to ensure that Duration would beat out Promescent® (then the market leader) to raise barriers to entry and capture the market.

131.    No privilege or justification applies to Defendants' interference with Absorption's prospective relationship with Auxilium, Target and Amazon.

132.    Because of Defendants' wrongful actions, Absorption lost out on the lucrative opportunity to be acquired by Auxilium.  Absorption therefore suffered losses of at least $150 million

and suffered other harm in amounts to be proven at trial.  Because of Defendants' wrongful actions, Absorption also lost out on lucrative distribution opportunities with Target, lost significant sales volume on Amazon, and suffered other harms in amounts to be proven at trial.

133.    Such conduct was fraudulent, oppressive, or malicious, and was carried out in conscious disregard of Absorption's rights, so as to justify an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Absorption respectfully requests that the Court enter an Order:

1.    Enjoining Defendants as well as their subsidiaries, partners, officers, agents, servants, employees, attorneys, and all those acting in concert with them, from (1) using any of Absorption's Trade Secrets; and (2) producing, marketing, or selling any product created using any of Absorption's Trade Secrets, including K-Y Duration;

2.    Awarding Absorption damages for actual losses, unjust enrichment, and/or reasonable royalties in accordance with 18 U.S.C. § 1836 and/or N.R.S. § 600A.050;

3.    Awarding Absorption exemplary damages, costs, and reasonable attorneys' fees in accordance with 18 U.S.C. § 1836(b)(3) and/or N.R.S. §§ 600A.050 & 600A.060;

4.    Entering a judgment awarding Absorption compensatory and punitive damages in connection with Absorption's claims for tortious interference and fraud, in an amount to be determined at trial; and

5.    Granting Absorption such other and further relief as this Court deems just and equitable.

Dated: February 21, 2017                          Respectfully submitted,

                                                  */s/ Patrick J. Reilly*

                                                  Patrick J. Reilly (Bar # 6103)
                                                  preilly@hollandhart.com
                                                  HOLLAND & HART
                                                  9555 Hillwood Drive, 2nd Floor
                                                  Las Vegas, Nevada 89134

                                                  Jonathan M. Weiss (*pro hac vice forthcoming*)
                                                  jonathan.weiss@kirkland.com
                                                  Diana Torres (*pro hac vice forthcoming*)

diana.torres@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California  90071

Reed S. Oslan (*pro hac vice forthcoming*)
reed.oslan@kirkland.com
Justin A. Barker (*pro hac vice forthcoming*)
justin.barker@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654

*Attorneys for Plaintiff Absorption
Pharmaceuticals, LLC*